UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | |
|---|---|
| JOYCE MARIE HUTT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 2:15CV40 RLW |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 1383(c)(3) for judicial review of Defendant's final decision denying Plaintiff's application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. For the reasons set forth below, the Court affirms the decision of the Commissioner.

## I. Procedural History

On February 28, 2012, Plaintiff protectively filed an application for Supplemental Security Income. (Tr. 11, 159-69) Plaintiff alleged that she became unable to work on October 31, 2008 due to schizophrenia, bipolar disorder, anxiety disorder, post-traumatic stress disorder ("PTSD"), agoraphobia, and asthma. (Tr. 89, 159) The application was denied, and Plaintiff filed a request for a hearing before an Administrative Law Judge ("ALJ"). (Tr. 88-106, 108) On November 4, 2013, Plaintiff testified at an administrative hearing before an ALJ via video teleconference. (Tr. 29-75) Plaintiff amended her alleged onset date of disability to January 1, 2011 that same date. (Tr. 202) On January 7, 2014, the ALJ determined that Plaintiff had not been under a disability since February 28, 2012, the date the application was filed. (Tr.11-24) Plaintiff then filed a request for review, and on April 1, 2015, the Appeals Council denied

Plaintiff's request. (Tr. 1-3) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. Evidence Before the ALJ

At the November 4, 2013 hearing before the ALJ, Plaintiff was represented by counsel. Upon questioning by the ALJ, Plaintiff testified that she was 34 years old. She weighed 170 pounds and measured 5 feet 5 inches. Plaintiff was married with four children and lived with her family in an apartment. She received child support for her two oldest children, and her husband worked. In addition, Plaintiff received food stamps and Medicaid. She applied for unemployment benefits but did not file all of her paperwork. Plaintiff completed the 10th grade and had no further education or training. She had a Facebook page, but her children primarily used it. Plaintiff stated that she did not know how to use the internet very well. (Tr. 34-38)

Plaintiff testified that she unable to work because of her anxiety and depression. While she could get a job, she could not keep a job. She last worked about a year ago as a cook in a restaurant. She held that position for one or two months. Plaintiff went on early maternity leave and did not return to work after her baby was born. She planned to begin working for a different restaurant but the restaurant closed down. Prior to her most recent job, Plaintiff worked as a cook on and off for about five years at a sports bar and grill. She also worked for The Fulfillment Center taking and packing orders. Plaintiff quit that job because she had problems with her asthma due to dust in the warehouse. (Tr. 38-42)

Plaintiff stated that she woke up around 6:00 or 6:30 a.m. and got her kids ready for school. Her older children took the bus to school, and Plaintiff drove her three-year-old child to and from school every day. Plaintiff spent her day caring for her nine-month-old baby. She read books to her kids and watched TV. She did not go outside frequently, but she attended her

children's sporting events and parent-teacher conferences. Plaintiff testified that she had no hobbies, and she usually cooked at home. Plaintiff was able to dress, shower, and cook meals. She went grocery shopping once a month for about one or two hours. Plaintiff usually shopped for her children's clothes and shoes at Walmart. She did the dishes, laundry, and housework. She sometimes visited with her grandfather, mother-in-law, brothers, or brother-in-law and his children. Plaintiff and her husband did not do anything together. She attended funerals, but she and her family stayed home over holidays. Plaintiff smoked a pack of cigarettes a day. She drank alcohol when she was not pregnant, but very little. Plaintiff unsuccessfully tried to quit smoking with Chantix. (Tr. 42-49)

Plaintiff was pregnant at the time of the hearing. She testified that she was not taking an antidepressant because she did not want to hurt the baby. She last took her medications five and a half months ago. Her medications included Abilify and Klonopin as needed. She also used an Albuterol inhaler and a nebulizer for asthma. Plaintiff stated that the Abilify and Klonopin helped, but she only took the Klonopin when she felt her anxiety coming on because it made her tired. She saw a Nurse Practitioner, Beth Brothers, for illnesses, and she saw Dr. Spalding for mental health treatment. She had not seen Dr. Spalding for four or five months because she did not always have gas money to travel. Dr. Spalding prescribed medications for Plaintiff's anxiety, depression, and bipolar disorder. Plaintiff took allergy medicine daily to avoid triggering her asthma. Plaintiff also testified to having a mitral valve prolapse. She was recently in the ER due to chest pain, which doctors attributed to anxiety. (Tr. 49-52)

Plaintiff stated that because of her depression, there were days she wanted to do nothing. She did her best to take care of her kids on those days. When she was anxious, Plaintiff could not breathe, and she shook and sometimes had blackouts. Stress triggered her anxiety attacks.

3

Dealing with her issues on a daily basis was stressful. She normally was not around other people, and she preferred to be at home by herself and with her children. Plaintiff became nervous and had anxiety attacks when meeting with teachers or going to the store. (Tr. 52-53)

Plaintiff's attorney also questioned her about her symptoms. Plaintiff testified that she experienced symptoms of depression every day. She cried for no reason daily. Her mother lived with her for two years but planned to move out that week. Plaintiff's mom was helpful with the kids and the cooking. Her eleven-year-old daughter also knew how to cook. Plaintiff did not feel like cooking at least once or twice a week. In addition, Plaintiff described her bipolar disorder as feeling hyper with a burst of energy sometimes and then feeling mad at the world other times. Plaintiff experienced anxiety attacks once or twice every week or two. Her panic attacks became worse after her baby passed away in 2008. (Tr. 53-56)

With regard to her prior jobs, Plaintiff testified that she called in or was sent home at least once a week due to anxiety attacks or crying spells. Her supervisors also spoke with her about her job performance. Plaintiff did not like being around people, and as a cook she occasionally had to interact with the public when taking food to the buffet table. She tried not to talk to anybody while working, so she did not experience problems getting along with coworkers or supervisors. Plaintiff became nervous, anxious, and teary when talking to others. Plaintiff did not talk to or interact with her husband. She believed she would need to take unscheduled breaks in a work environment. When Plaintiff last worked, she would sit down or walk outside alone if she felt anxious or upset. Some supervisors understood; others did not. Plaintiff stated that when she walked, she became short of breath. Her asthma was also worse when the pollen was high. (Tr. 56-59)

4

A vocational expert ("VE") also testified at the hearing. Plaintiff's attorney objected to the VE's qualifications to testify as to the number of jobs existing locally, regionally, or nationally. The ALJ took the objection under advisement. The VE testified that Plaintiff's past jobs were as a cook and an inspector and hand packager. The ALJ then asked the VE to assume a person who could work at all exertional levels except the person must avoid concentrated exposure to extreme cold, heat, and humidity; and could tolerate no more than occasional exposure to fumes, odors, dust, gases, and poor ventilation. The individual was limited to simple, routine, and repetitive work that was unskilled, and she could have occasional, superficial contact with supervisors, coworkers, and the public. The VE stated that the person could not perform Plaintiff's past work as a cook but could perform some packaging jobs in a clean-air environment, not a factory where Plaintiff previously worked. The VE further stated that the individual could work as a hotel-motel cleaner or office cleaner, an inspector, and a hand packager. (Tr. 60-66)

Counsel for Plaintiff also questioned the VE, asking him to consider the ALJ's hypothetical and also assume the person would call in absent once a week. Given this limitation, the VE stated that the jobs to which he testified would be eliminated. Further, if the individual required one to two unscheduled breaks in an unskilled work environment, the employer would either accommodate the situation or have reason to terminate the employee. The VE further stated that the most a worker could be off task and sustain a job in an unskilled work environment would be no more than 20 to 30 minutes, provided she could make up for the lost time by improving her performance. Additionally, a worker could only miss 1.8 to two days a month and sustain a job. The VE also stated that the cleaning jobs and the inspector/hand packager jobs required only one or two steps. (Tr. 66-74)

5

On March 8, 2012, Plaintiff completed a Function Report – Adult. Her daily activities included getting kids ready for school, feeding her toddler, and laying on the couch until she needed to get up. She required help with cleaning and cooking on the days that she did not want to do anything. She was able to cook, do laundry, and clean. In addition, she shopped once or twice a month for food, kids' shoes, and clothes. Plaintiff reported that she took care of her kids but did not do anything or go anywhere unless it involved her children. She only attended her kids' sporting events. Plaintiff had problems getting along with family and friends because they made her mad easily. Her conditions affected her ability to talk, remember, complete tasks, concentrate, understand, follow instructions, and get along with others. She believed she could walk 3 blocks before needing to rest for 10 minutes. Plaintiff could pay attention for 10 to 20 minutes. She did not follow recipes to cook, and she often forgot spoken instructions before finishing the task. Plaintiff had been fired from a job for her temper. She did not handle stress well, and changes in routine made her nervous. She experienced blackouts. (Tr. 225-32)

Plaintiff's friend, Tammy Niffen, also completed a Function Report Adult – Third Party. Ms. Niffen reported that she spent time with Plaintiff every day. Plaintiff cooked and took care of her kids. Her mother and friends sometimes helped to allow Plaintiff to be by herself. Plaintiff did chores around the house but not outside. She needed help taking care of herself. Ms. Niffen also stated that Plaintiff did not like to be around people, so she mostly stayed home. She shopped twice a week. Plaintiff's hobbies and interests included watching TV, taking care of her kids, and playing with them. Ms. Niffen reported that Plaintiff was very moody and became upset quickly. Ms. Niffen opined that Plaintiff's conditions affected her ability to understand, follow instructions, complete tasks, get along with others, and remember. Plaintiff could only pay attention for 10 minutes, and she could not follow written instructions. She could

follow spoken instructions if she did not get upset at the way they were spoken. Ms. Niffen stated that Plaintiff got along okay with authority figures at times, but she could be outspoken. Plaintiff had been fired for not working well around people. She could not handle stress, and she did not like changes in routine. Ms. Niffen stated that Plaintiff was a good person and a good mother. However, she needed to be reminded to take care of herself and to eat. She could be very moody and hateful at times. (Tr. 237-44)

### III. Medical Evidence

On April 13, 2011, Karen A. MacDonald, Psy.D., performed a psychological evaluation on behalf of the Pike County Family Support Division. Dr. MacDonald noted that Plaintiff was taking Klonipin and Metoprolol, and she previously took Xanax for anxiety. Plaintiff complained of mood swings, reactive anger, auditory hallucinations, and blackouts. She also had a history of suicidal ideation. During her mental status exam, Plaintiff was cooperative with no difficulty relating to Dr. MacDonald. Her intellectual functioning was in the low average range. Dr. MacDonald noted some impairment in delayed auditory memory, attention and calculation, recall of detailed instructions, abstract motor speed, and pace and persistence. She was able to recall and follow simple instructions. Dr. MacDonald assessed Bipolar I Disorder, severe with psychotic features. Dr. MacDonald also diagnosed Panic Disorder, which was evidenced by chest pain, face numbness, an inability to breathe, and shaking. Plaintiff's Global Assessment of Functioning ("GAF") was 40, indicating severe symptoms. (Tr. 278-80)

Plaintiff presented to Dr. Lyle Clark on September 21, 2011 for a psychiatric evaluation. Plaintiff stated that she started new medication and needed to see a psychiatrist to determine whether she was taking the right medication. Upon examination, Dr. Clark noted that Plaintiff's mood was depressed, her affect was appropriate, and her insight and judgment were adequate.

Dr. Clark opined that Plaintiff had symptoms which caused her significant distress and interfered with her functioning. He assessed Schizoaffective Disorder, Bipolar type; Intermittent Explosive Disorder; Panic Disorder with Agoraphobia; Social Phobia, generalized type; and Post Traumatic Stress Disorder. He noted that Plaintiff lost a baby to SIDS three years ago. Dr. Clark assigned a GAF of 55, and he planned to restart Risperdal, increase Klonopin, and continue Effexor. (Tr. 424-27)

Dr. Clark continued treating Plaintiff through medication management until April 2012. On October 21, 2011, Dr. Clark noted that Plaintiff was doing considerably better and was looking for work. Her mood was much more stable, and she had no further problems with anger. Dr. Clark assessed Schizoaffective Disorder, Bipolar type, and continued Risperdal and Klonopin. (Tr. 428-29) On January 31, 2012, Plaintiff reported that she had not been taking her medication as prescribed but instead took it intermittently. She had been irritable and slept during the day. Dr. Clark advised Plaintiff about mood disorders and the importance of taking her medication daily. Mental status exam was normal. Dr. Clark assessed increased symptoms due to poor adherence and prescribed Abilify in the place of Risperdal. (Tr. 419-20)

Plaintiff returned to Dr. Clark on February 28, 2012. She reported doing better with sleep and energy. Her irritability was better, but she did not take Klonopin very often. Plaintiff reported that she continued to experience mood swings and tearfulness. Dr. Clark noted Plaintiff's mood appeared mildly depressed, and he increased Plaintiff's Abilify dosage. (Tr. 422-23) On April 3, 2012, Plaintiff reported increased problems with anxiety because she was trying to work part-time. The Klonopin made her tired, and she felt unsafe around the fryer at work. Mental status exam indicated a mildly depressed mood but was otherwise normal. Dr.

Clark assessed increased symptoms due to stress and continued Plaintiff's medications. He referred Plaintiff to Dr. Spalding. (Tr. 434-35)

Plaintiff was treated by Joseph Spalding, D.O., for medication management from May 2012 through May 2013. On May 22, 2012, Plaintiff reported that Abilify helped her depression but an increase in dosage caused her to feel anxious at night. On examination, Plaintiff's mood and affect were fair, but she was a bit guarded. Dr. Spalding assessed Bipolar I Disorder, most recent episode depressed, severe, with psychotic features; PTSD; Panic disorder with agoraphobia; and smoking. He assigned a GAF of 60. Dr. Spalding continued Plaintiff's medications and began Topamax. He also counseled Plaintiff on smoking cessation. (Tr. 439-42)

Plaintiff returned to Dr. Spalding on June 26, 2012. Plaintiff stopped taking her medications because she was pregnant. She reported that she was filing a disability appeal. She was tearful all the time and had blackouts when she became mad. Dr. Spalding noted that Plaintiff's mood and affect were depressed and a bit guarded. Her insight and judgment were fair. Dr. Spalding discontinued Plaintiff's medications due to her pregnancy but advised her not to isolate herself, which fed her depression. Her GAF was 45. (Tr. 443-46) On July 25, 2012, Plaintiff reported being tired. She started working for a restaurant two weeks ago. Plaintiff had a depressed mood and affect, and she appeared tearful. She began taking fish oil. Plaintiff continued to smoke. Dr. Spalding referred her to a stop smoking clinic. (Tr. 447-50)

Plaintiff did not see Dr. Spalding again until May 1, 2013. Her baby was born on January 29, 2013 and was on a monitor. During her pregnancy, Plaintiff developed diabetes and gallstones. She reported being more depressed since delivery. Dr. Spalding restarted Abilify

9

and clonazepam. He educated Plaintiff on a healthy diet and need for exercise. Dr. Spalding also referred Plaintiff for nutrition counseling. (Tr. 451-53)

Plaintiff presented to the ER on multiple occasions for anxiety and panic attacks. (Tr. 333-36; 348-51; 520-21) Most recently, she was treated in the ER for shortness of breath, and Dr. Samuel Chandra diagnosed anxiety and panic attack on October 6, 2013. Upon discharge, Dr. Chandra noted that Plaintiff may return to work/school/daycare and resume normal activity. (Tr. 483-85)

On July 22, 2013, Thomas J. Spencer, Psy.D., performed a psychological evaluation on behalf of Medicaid. Plaintiff's chief complaint was that she had been on antidepressants since the age of 16. Dr. Spencer observed that Plaintiff's speech was flat, her mood tired, and her affect restricted. Her insight and judgment were intact. Dr. Spencer assessed Bipolar disorder, PTSD by history, and a GAF of 50-55. He opined that Plaintiff had "a mental illness, one which interferes with her ability to engage in employment suitable for her age, training, experience, and/or education. The duration of the disability could exceed 12 months, but with appropriate treatment and compliance, prognosis improves." (Tr. 557-61)

## IV. The ALJ's Determination

In a decision dated January 7, 2014, the ALJ found that Plaintiff had not engaged in substantial gainful activity since February 28, 2012, the application date. The ALJ further found that Plaintiff had the following severe combination of impairments: bipolar disorder – severe, with psychotic features; panic disorder; schizoaffective disorder – bipolar type; intermittent explosive disorder; PTSD; social phobia – generalized; asthma; and diabetes. However, she did not have an impairment or combination thereof that met or medically equaled the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 11-16)

After carefully considering the entire record, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels. However, the ALJ added several nonexertional limitations. The ALJ noted that Plaintiff must avoid concentrated exposure to extreme cold, heat, and humidity. She was limited to no more than occasional exposure to fumes, odors, dusts, gases, and poor ventilation. She was also limited to simple, routine, and repetitive work, consistent with unskilled work as defined by the Dictionary of Occupational Titles ("DOT"). Finally, Plaintiff was limited to occasional, superficial contact with supervisors, coworkers, and the general public. While the ALJ found that Plaintiff was unable to perform any past relevant work, the ALJ determined that jobs existed in significant numbers in the national economy which Plaintiff could perform. In making this determination, the ALJ noted Plaintiff's younger age, limited education, prior work experience, and her RFC. Such jobs included cleaner; inspector, hand packager; and hand packager. Therefore, the ALJ concluded that Plaintiff had not been under a disability as defined in the Social Security Act since February 28, 2012, the date Plaintiff filed her application. (Tr. 16-24)

## V. Legal Standards

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. The Social Security Act defines disability "as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process. *See* 20 C.F.R. § 404.1520(a)(4). Those steps require a claimant to show: (1) that claimant is not engaged in substantial gainful activity; (2) that she has a severe physical or

11

mental impairment or combination of impairments which meets the duration requirement; or (3) she has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) she is unable to return to her past relevant work; and (5) her impairments prevent her from doing any other work. *Id.*

The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence means less than a preponderance, but sufficient evidence that a reasonable person would find adequate to support the decision." *Hulsey v. Astrue*, 622 F.3d 917, 922 (8th Cir. 2010). "We will not disturb the denial of benefits so long as the ALJ's decision falls within the available zone of choice. An ALJ's decision is not outside the zone of choice simply because we might have reached a different conclusion had we been the initial finder of fact." *Buckner v. Astrue,* 646 F.3d 549, 556 (8th Cir. 2011) (citations and internal quotations omitted). Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. *See Young v. Apfel,* 221 F.3d 1065, 1068 (8th Cir. 2000).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment. *Johnson v. Chater*, 108 F.3d 942, 944 (8th Cir. 1997) (citations and internal quotations omitted).

The ALJ may discount a plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. *Marciniak v. Shalala*, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that she considered all the evidence. *Id.* at 1354.

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints under the *Polaski*[1] factors and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount the testimony as not credible. *Blakeman v. Astrue*, 509 F.3d 878, 879 (8th Cir. 2007) (citation omitted). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. *Marciniak*, 49 F.3d at 1354.

## VI. Discussion

In her Brief in Support of the Complaint, Plaintiff raises one argument. Plaintiff claims that the ALJ erred by failing to provide "good/specific/supported" reasons for rejecting the opinion of specialist Dr. Spencer. Plaintiff asserts that the ALJ should have assigned more weight to Dr. Spencer's opinion as an examining licensed psychologist. Defendant, on the other

---

[1] The Eight Circuit Court of Appeals "has long required an ALJ to consider the following factors when evaluating a claimant's credibility: '(1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.'" *Buckner v. Astrue*, 646 F.3d 549, 558 (8th Cir. 2011) (quoting *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009)) (citing *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)).

hand, contends that the ALJ properly evaluated the opinion of the consultative psychological examiner and properly accounted for Plaintiff's mental limitations.

The Plaintiff asserts that the ALJ erred in evaluating the opinion of Dr. Spencer, who performed a consultative psychological examination on July 22, 2013. The ALJ acknowledged that Dr. Spencer stated that Plaintiff had a mental illness that would interfere with her ability to work. However, the ALJ specifically noted that "statements that the claimant is disabled are not medical opinions." (Tr. 21) Further, the ALJ found that because Dr. Spencer personally examined Plaintiff, his statement had at least some persuasive value. Thus, the ALJ gave Dr. Spencer's opinion partial weight. (Tr. 21) Plaintiff argues that the ALJ failed to provide sufficient support for attributing only partial weight to Dr. Spencer's opinion.

The record demonstrates that Dr. Spencer evaluated Plaintiff on only one occasion to assist in the determination of Plaintiff's Medicaid eligibility. "A single evaluation by a nontreating psychologist is generally not entitled to controlling weight." *Teague v. Astrue*, 638 F.3d 611, 615 (8th Cir. 2011) (citation omitted). Further, Dr. Spencer based his opinion on Plaintiff's subjective complaints, as the mental status exam was essentially normal with only flat speech and restricted affect, but otherwise flow of thought and insight/judgment were intact. She denied thoughts of suicide, and she perceived no delusions or hallucinations. Plaintiff was oriented to place, time, and event, and her memory and attention/concentration were good. Dr. Spencer assessed a GAF of 50-55, which demonstrated moderate impairment.[2] (Tr. 560) The

---

[2] A GAF score of 51 to 60 indicates "moderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning," *Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR)* 34 (4th ed. 2000).

The Court notes that DSM-V was released in 2013 and replaced the DSM-IV. The DSM-V "no longer uses GAF scores to rate an individual's level of functioning because of 'its conceptual lack of clarity' and 'questionable psychometrics in routine practice.'" *Alcott v. Colvin*, No. 4:13-CV-01074-NKL, 2014 WL 4660364, at *6 (W.D. Mo. Sept. 17, 2014) (citing

14

ALJ acknowledged Dr. Spencer's findings and noted that the evidence in the record did not support the severity of Plaintiff's subjective allegations. (Tr. 17-18) The ALJ may discount a consulting psychologist's opinion where it is based on plaintiff's subjective complaints and not objective findings. *Teague*, 638 F.3d at 616. Additionally, the ALJ may properly give little weight to an opinion that consists of vague, conclusory statements or is merely a checklist with no elaboration. *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010).

Further, Dr. Spencer opined that the duration of Plaintiff's disability "could" exceed 12 months but that her prognosis improved with appropriate treatment and compliance. (Tr. 561) The record indicates, and the ALJ noted, that Plaintiff's mental impairments improved with medication. (Tr. 17, 423, 435, 439) Indeed, Plaintiff conceded to Dr. Spencer that she had taken Abilify and Klonopin, and she felt the medication helped. (Tr. 558) "An impairment which can be controlled by treatment or medication is not considered disabling." *Estes v. Barnhart*, 275 F.3d 722, 725 (8th Cir. 2002) (citation omitted); *see also Brace v. Astrue*, 578 F.3d 882, 885 (8th Cir. 2009) ("There is substantial evidence that, when taken as directed, the medication [plaintiff] was prescribed was successful in controlling his mental illness.").

Likewise, the ALJ noted that Plaintiff did not consistently seek treatment for her mental impairments. (Tr. 20) "The absence of any evidence of ongoing counseling or psychiatric treatment or of deterioration or change in . . . mental capabilities disfavors a finding of disability." *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000) (citation omitted). While Plaintiff attributed her lack of treatment to the fact that she could not afford gas, the ALJ correctly noted that she was able to smoke up to a pack of cigarettes daily. (Tr. 20) Although

---

*Rayford v. Shinseki*, 2013 WL 3153981, at *1 n.2 (Vet. App. 2013) (quoting the DSM-V)). However, because the DSM-IV "was in use when the medical entries were made and the [ALJ's] decision was issued in this matter, the Global Assessment of Functioning scores remain relevant for consideration in this appeal." *Rayford*, 2013 WL 3153981, at *1 n.2.

15

Plaintiff complained of disabling mental impairments, nothing in the record suggests that she chose to quit her smoking habit in order to afford transportation to receive treatment. *See, e.g., Riggins v. Apfel*, 177 F.3d 689, 693 (8th Cir. 1999) (finding thee evidence supported the ALJ's conclusion that complaints of disabling pain were not credible where the evidence did not suggest that plaintiff chose to forego smoking to finance medication); *Theis v. Astrue*, No. 4:11CV799MLM, 2012 WL 2282501, at *9 (E.D. Mo. June 18, 2012) (noting that the ALJ properly considered the inconsistency between plaintiff's suggestion that he could not afford treatment and his ability to afford cigarettes ).

Further, the ALJ correctly found that Dr. Spencer's statement regarding a Plaintiff's disability was not a medical opinion, and instead such finding was reserved to the Commissioner. (Tr. 21) While Dr. Spencer opined that Plaintiff's mental illness interfered with her ability to work and that her "disability" could last over 12 months, "the ultimate conclusion of whether [Plaintiff] could sustain gainful employment is a question for the Commissioner." *Van Vickle v. Astrue*, 539 F.3d 825, 830 (8th Cir. 2008) (citing 20 C.F.R. § 404.1527(e)(1)); *see also Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005) ("A medical source opinion that an applicant is 'disabled' or 'unable to work,' however, involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight.") (citation omitted). Here, however, the ALJ did give some credit to Dr. Spencer's opinion and incorporated those credible findings in the RFC. For instance, the ALJ limited Plaintiff to simple, routine, and repetitive work, as well as only occasional superficial contact with supervisors, coworkers, and the general public. (Tr. 16, 18) Indeed, Dr. Spencer's examination notes did not indicate symptoms or impairments so severe as to preclude all work. "A physician's statement that is 'not supported by diagnoses based on objective evidence' will

not support a finding of disability." *Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007) (quoting *Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003)). In addition, "[i]f the doctor's opinion is 'inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight.'" *Id.*

The Court finds that the ALJ's RFC assessment is supported by medical evidence contained in the record as a whole. The ALJ need not rely entirely on a particular doctor's opinion or choose between opinions. *Martise v.Astrue*, 641 F.3d 909, 927 (8th Cir. 2011). Here, the ALJ properly performed an exhaustive analysis of the medical records and noted the inconsistencies in the record between the Dr. Spencer's opinion and other substantial evidence. *Id.* at 926; (Tr. 17-18).

Last, Plaintiff argues that the ALJ should have re-contacted Dr. Spencer for clarification or ordered a consultative examination. The Court disagrees. "While the ALJ has an independent duty to develop the record in a social security disability hearing, the ALJ is not required 'to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped.'" *Goff v. Barnart*, 421 F.3d 785, 791 (8th Cir. 2005) (quoting *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)). Here, the ALJ did not find that Dr. Spencer's report was inadequate or incomplete, nor did the ALJ determine Dr. Spencer used unacceptable clinical techniques. *Id.* "Instead the ALJ discounted the opinion[ ] because [it was] inconsistent with other substantial evidence." *Id.* Thus, the ALJ properly assigned only partial weight to Dr. Spencer's opinion, and no further clarification was necessary. *Id.* Likewise, "[t]he ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled." *McCoy v. Astrue*, 648 F.3d 605, 612 (8th Cir. 2011) (citation omitted). The report from Dr. Spencer, Plaintiff's medical

treatment records, and her extensive daily activities,[3] constitutes substantial evidence to support the ALJ's decision, and further examinations were not required. *See Johnson v. Astrue*, 627 F.3d 316, 320 (8th Cir. 2010) (finding IQ test was not warranted where medical evidence and plaintiff's daily activities indicated the record of plaintiff's IQ was sufficiently developed). Therefore, the Court finds that substantial evidence supports the ALJ's determination, and Court will affirm the final decision of the Commissioner.

Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying social security benefits is **AFFIRMED**. A separate Judgment in accordance with this Memorandum and Order is entered this same date.

Dated this 6th day of September, 2016.

RONNIE L. WHITE
UNITED STATES DISTRICT JUDGE

---

[3] Plaintiff does not object to the ALJ's findings regarding Plaintiff's daily activities. The Court notes that the ALJ correctly determined that Plaintiff's activities of caring for her children, attending sporting events, driving, shopping, cooking, and cleaning were inconsistent with her allegations of disability. (Tr. 15, 19, 21)